BROADWELL *v.* BROADWELL.

1. DIVORCE—PROPERTY SETTLEMENT—THREATS—DURESS.

In a suit by a wife to set aside a property settlement made with her husband in contemplation of divorce proceedings, on the ground of duress, the finding of the court below that she was induced to make said settlement under threats of her husband to expose the fact that their daughter was born out of wedlock, *held*, justified by the record.

2. SAME—EQUITY—JURISDICTION—SETTING ASIDE PROPERTY SETTLEMENT OBTAINED BY THREATS.

If the husband procured the wife's consent to a property settlement by threats, whether in law they constitute duress, coercion, or fraud, a court of equity has power to relieve her therefrom.

3. SAME—LACHES—LAPSE OF TIME WILL NOT PRECLUDE RELIEF.

Where the same considerations which moved a wife to enter into a property settlement under threats of her husband to expose a secret in her past life would control any action on her part to set it aside until her secret could no longer be concealed, lapse of time since the agreement was entered into would not preclude her from obtaining relief.

Appeal from Wayne; O'Brien (Patrick H.), J., presiding. Submitted April 12, 1923. (Docket No. 53.) Decided July 19, 1923.

Bill by Louis O. Broadwell against Allie M. Broadwell for a divorce. Defendant filed a cross-bill asking for a divorce. From a decree for defendant, plaintiff appeals. Modified and affirmed.

*J. Shurly Kennary*, for plaintiff.

*Lodge & Brown, E. A. Fink* and *Francis Hilton*, for defendant.

On validity of separation agreement as affected by fraud, coercion, unfairness, or mistake, see note in 5 A. L. R. 823.

SHARPE, J.   Defendant was granted a decree of divorce on the cross-bill filed by her to plaintiff's bill therefor.   Prior thereto, the parties, in contemplation of divorce proceedings, had entered into an agreement, by the terms of which defendant released all her rights to support and maintenance.   The trial court found that this agreement was executed by her under duress, set it aside and decreed defendant $5,000 in money—

"toward alimony and to cover the defendant's cost and expenditures in the support and education of their daughter, Virginia, since the separation of the parties to this case,"

out of which she must pay an unpaid bill due the Liggett School, which Virginia had attended, and on which bill suit had been brought, $1,000 for attorney's fees and costs and disbursements of suit to be taxed, and a one-fourth undivided interest in substantially all of the property owned by plaintiff.   From this decree plaintiff appeals.   No question is raised concerning the provision in it for divorce, which was granted on the ground of extreme cruelty.   It is insisted that the property settlement should be declared binding and conclusive of defendant's rights in plaintiff's property.

To fully understand the claim of duress as made by defendant, it is necessary to set forth at some length the facts disclosed by the record.   The parties were married in Indiana on July 21, 1897.   Both had been married before and each divorced, the defendant in 1893 and the plaintiff in 1897.   Before marriage their relations had resulted in the birth of a child, Virginia, on April 25, 1896.   They came to Detroit in 1899 and have since resided there.   Each had some money, the defendant perhaps the greater amount.   Some property was purchased in their joint names.   In 1908 all of this property was transferred

to her.   In 1910 the plaintiff made a trip to Isle Royale in connection with some mining property there in which he had an interest, and on his return in October he found that the defendant had left their home.   They have not lived together since that time.

In November, 1910, defendant filed a bill for divorce through her attorney, Clarence E. Wilcox.  In December of the same year she filed another bill to quiet title in her to certain lands, the description of which she claimed had been fraudulently inserted in a deed executed and delivered to plaintiff.   In both of these cases the plaintiff was represented by Edmund C. Shields.   After many conferences and much negotiation between counsel and the respective parties, the settlement agreement in question was entered into on February 11, 1911.   By its terms, the parties agreed upon a division of all the property interests owned by them jointly and severally and conveyances were afterwards executed and delivered pursuant thereto.   It is her claim that she was induced to enter into this agreement by threats of the plaintiff to reveal the fact that their daughter Virginia had been born out of wedlock and that she otherwise would not have executed it.   The plaintiff denied that any such threats were made.   The trial court found that such threats were made.   He said:

"I have come to this conclusion not only from the testimony of the defendant herself, but also from a careful consideration of the testimony of Mr. Wilcox."

As to such threats the defendant testified:

"*Q.* *  *  * What efforts, if any, were made to induce you to sign, to make that settlement, were you willing to make it?

"*A.* I was not willing to make any settlement with him.

"*Q.* How did you come to do it?

"*A.* I thought he should be punished for what he had done, but under the circumstances he told me un-

less I took his offer why he would disclose the secrets that were dear to some one close to me, and would take my life, in some way, or the lives of those that were dear to me.

"*Q.* What was that secret?

"*A.* That was Virginia.

"*Q.* About her birth?

"*A.* Yes.

"*Q.* Let me see, he said, unless you signed that—

"*A.* Unless I took the offer that he gave me he would disclose everything.

"*Q.* Who did he say he would disclose it to?

"*A.* He would tell everyone that he knew, he would disgrace me as far as he could.

"*Q.* What effect did that have on you?

"*A.* It made me extremely nervous, and I thought if he paid the $70 a month and I could get along with the Colonial and other things, and he lived up to the contract there might be a way out, and in time perhaps he would see the injustice that he had done us.

"*Q.* Did he say the agreement was that you were to get $70 every month, as you understood it?

"*A.* Until the divorce.

"*Mr. Kennary:* I object to that.

"*Q.* Until the divorce was granted?

"*A.* Yes.

"*Q.* Did you tell this to Mr. Wilcox what he had threatened to do by the way of such disclosure?

"*A.* I never did.

"*Q.* Did Mr. Wilcox know these things with reference to your marriage?

"*A.* He never did, he never knew.

"*Q.* Where were you two at the time he was making these threats?

"*A.* He would meet me, we went into the office, and these would be the things he would say to me just before we went into the office.

"*Q.* What office?

"*A.* Mr. Wilcox's. Once he met me in the elevator and turned to me in the hall and he wrote me a letter, wrote me a piece of paper, and had that not been destroyed that would be all I would have to show.

"*Q.* What did he say on that letter or that piece of paper?

"*A.* He made all these threats, as to what he would do unless I accepted.

"*Q.* Just give us the language as written on that paper?

"*A.* As near as I can remember, he said if I went any further in the matter and refused to accept this settlement, I cannot tell you just the words—I will tell you in substance, that he would ruin both my children by the disgrace that he would advertise."

Mr. Wilcox was called as a witness by plaintiff without having had any opportunity to refresh his recollection from memoranda in his office.    He testified:

"*Q.* And you, as her attorney, at that time considered that she was receiving a fair, equitable settlement of the property that she listed?

"*A.* As her attorney I never felt that the matter was as thoroughly gone into as it should have been, considering the amount of property involved.

"*Q.* What do you mean by that, Mr. Wilcox?

"*A.* I mean by that, there were so many ramifications as to source of original investment out of which this property was created, the extent of the estate which she inherited which she said she had turned over to her husband; the question of the alleged forgeries in the deeds which we filed a suit to set aside; the extent to which she had contributed and Mr. Broadwell had contributed; the great difference in the value of the estimates of the property were— I did not feel as her attorney I knew enough about the facts or had time to go into it thoroughly enough to satisfy myself as to whether it was a good settlement or not."

On cross-examination he testified:

"*Q.* Did Mrs. Broadwell at all times appear to you to be entirely frank in telling all of the facts and circumstances connected with certain of her relation to her or not?

"*A.* I never felt that the understanding existed between client and myself as my experience is to have usually exist.

"*Q.* Her manner betrayed that, did it not, to you?

"*A.* No, not so much her manner, but so many things

said, and discussed that you could never just say, figure for absolute certainty by way of proof.

"*Q.* And that feeling caused by what was ever said or done was—or how she appeared, persisted in your mind up to the time that this settlement was signed, this stipulation was signed, did it not?

"*A.* Yes, sir.

"*Q.* And, when your connection with the matter ceased, you felt and you still have the feeling that you were not in possession of all the circumstances?

"*A.* I did not have that feeling so much as another feeling.

"*Q.* What was that?

"*A.* The feeling that I had was that the matter should have gone into court and all of this conflicting testimony aired out and the thing decided upon the facts and settlement made upon the facts. That is always the feeling I had.

"*Q.* I see your point. I am trying to get at something else. Now, Mr. Wilcox, I am frank to say that it is difficult for me to frame the question properly so as to draw that thing out. For instance, when the necessities of Virginia were discussed, did you go into the question of Virginia's birth and early childhood very extensively?

"*A.* Not at all.

"*Q.* You did not attempt to?

"*A.* No, sir.

"*Q.* Did she go into it herself with you?

"*A.* No, sir.

"*Q.* Did she at the time, at the time of the signing of the stipulation of settlement, for settlement, are you sure that you—or did you feel sure that you were in possession of all the motives that induced her to sign that stipulation?

"*A.* I do not know that I can answer that by 'no.'

"*Q.* Anyway, either way, answer it. I want the court to get your knowledge on the subject, or the things that occurred to you to produce any opinion relating to that time in your mind?

"*A.* I thought that Mrs. Broadwell was allowing herself or permitting herself to be what you might term rushed into a property settlement. She seemed to be very anxious to make a settlement, and I, myself, delayed the settlement to some extent to see if

there would be any change in that attitude on her part, but there was no change in her attitude on her part, she was desirous of making the settlement out of court, and this was the settlement that seemed to satisfy her.

"*Q.* She was nervously anxious, wasn't she, to get that settlement made?

"*A.* She was persistent to have it done as quickly as possible.

"*Q.* She was nervous about it, in an eager frame of mind to make the settlement?

"*A.* I would not say she was nervous, she was just persistent.

"*Q.* Did you know at the time that there was an episode in her life that she was afraid of having brought to the light if she did not make this settlement?

"*A.* No, sir."

The only reference to their daughter Virginia in the settlement agreement was in the following undertaking on his part:

"He will leave open the question of what provision he is to make for the maintenance, care and education of their daughter, Virginia Broadwell."

The omission to provide for Virginia can be accounted for only by the desire to conceal the date of her birth, as had provision for her been made the question of her age would have been considered. This circumstance, we think, tends to corroborate the claim in this respect made by defendant.

We are impressed, as was the trial court, that the defendant has sustained the burden of proof in establishing the fact that the settlement was executed because of the threats of exposure made by the plaintiff as claimed by her. The parties at that time were husband and wife. If the plaintiff procured her consent to the agreement by such threats, whether in law they constitute duress, coercion or fraud, we think a court of equity has the power to relieve her there-

from.    As was said in *Witbeck* v. *Witbeck*, 25 Mich.
439, 442:

"It seems to be supposed by the defendant, that,
in order to invalidate an agreement between husband
and wife, she must make out the same full and positive
showing of actual fraud or duress, as against a
stranger.    The law, certainly, does not prevent
persons in this confidential relation from doing,
without urgency, of their own accord, and under the
natural impulses of kindness and affection, such
generous acts as are the results of mutual confidence
and' good-will.    But the same principle which en-
courages confidence, protects it by preventing any
profit to be gained from abusing it.    The law recog-
nizes the fact that a married woman is easily sub-
jected to a species of coercion, very much more
effectual than any ordinary operation of fear or fraud
from strangers.    It has always been found necessary
to examine jealously into all transactions whereby the
husband gets an advantage over the wife, not plainly
spontaneous on her part.    Any undue advantage
gained by the use of the marital relation, is a legal
fraud on the wife, which courts of equity will not allow
to stand to her prejudice."

We are not impressed by the claim of plaintiff's
counsel that her acceptance of the provisions of the
agreement and the lapse of time since the same was
entered into precludes her from obtaining relief
against it.    The same considerations which moved
her to enter into it would control any action on her
part to set it aside until it became apparent that her
secret could no longer be concealed.    In the bill for
divorce filed by her in 1910 she had stated that
Virginia was 12 years old, whereas in fact she was
14.    No effort was made by defendant to require
plaintiff to pay any sum towards her maintenance or
education, the expense thereof having been borne by
defendant alone.

We feel constrained, however, to modify the allow-
ance made for the defendant in the decree.    We may

take into consideration the value of the property received by her under the settlement agreement. *Bechtel* v. *Barton*, 147 Mich. 318, 328.    She is now 55 years of age.    Her inability to properly care for property or invest moneys has been demonstrated. She now claims to be practically penniless.   The plaintiff is possessed of considerable property, the value of which we do not find to be stated.    We do not think that he should be required to convey to defendant any interest therein.    The provision in the decree as to money payments to be paid to defendant is affirmed, except that the allowance for attorney's fees shall include the costs and expenses of suit.    He shall hereafter pay to her during her lifetime the sum of $100 monthly, the same to be paid on the first day of each month after the entry of the decree.

The conclusion reached renders it unnecessary to consider the question whether such a settlement precludes a court from making an allowance independent thereof for alimony and maintenance of minor children as provided for in the statute.

As thus modified, the decree is affirmed, with taxable costs to defendant.

FELLOWS, MCDONALD, CLARK, BIRD, MOORE, and STEERE, JJ., concurred.    WIEST, C. J., did not sit.